IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| TRIDENT BUILDERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:24-cv-02464-DCN |
| vs. | ) | |
| | ) | ORDER |
| AMERICAN RESIDENTIAL | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The following matter is before the court on plaintiff Trident Builders, LLC's ("Builders") motion to stay and compel arbitration. ECF No. 6. For the reasons set forth below, the court denies the motion.

## I. BACKGROUND

Builders is a general contractor in North Charleston, South Carolina. ECF No. 1, Compl. ¶ 2. It is one of multiple sister companies that operate under the name Trident (the "Trident Entities"). See id. ¶ 1 (alleging that Trident Construction Services, LLC is also a general contractor in North Charleston, South Carolina); see also ECF Nos. 1-2; 6-5 (examples of subcontracts signed by various Trident Entities). Defendant American Residential Services, LLC ("ARS") is a heating and air contractor incorporated in Delaware with its principal place of business in Memphis, Tennessee. Compl. ¶ 3. The dispute between Builders and ARS is centered around The Cape at Kiawah (the "Cape"), one of Builders's construction projects. Id. ¶ 4.

According to Builders, "[t]he Cape consists of six luxury condominium buildings and related amenities for residents, including a clubhouse and communal pool." Id. ¶ 14. Builders alleges that ARS submitted multiple bids to Builders to install the heating and

1

cooling systems for the six condominium buildings. Id. ¶ 15. Builders contends that, based on one of ARS's bids, it "issued a subcontract to ARS" for heating and cooling system work on September 3, 2021 (the "Cape Subcontract"). Id. ¶ 19. Builders concedes that neither party signed the Cape Subcontract but maintains that the parties agreed to be bound by that agreement. Id. ¶ 20; see also ECF No. 1-1 (the unsigned Cape Subcontract). In contrast, ARS asserts that it met with Builders about entering into a subcontract and that the two businesses discussed possible figures, but ARS denies ever having entered into a subcontract with Builders on the Cape project. ECF No. 8, Answer ¶¶ 9–21.

Notably, the unsigned Cape Subcontract contains the following mandatory arbitration provision:

> All claims, disputes and other matter in question between the Contractor and Subcontractor arising out of or relating to the Contract Documents or these parties' dealings of whatsoever kind or the breach thereof, whether involving the Owner, Contractor, Architect, or any other Subcontractor or material provider or Agents or Representatives thereof, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. The Subcontractor agrees that the Contractor may consolidate any dispute between these parties with other disputes arising out of the project including the Owner, it's Representatives, and Agents.

ECF No. 1-1 § 17.

When Builders initially filed this lawsuit, it did so with another Trident Entity, Trident Construction Services, LLC ("Services"), as a co-plaintiff. See Compl. Like Builders, Services also alleges that it entered into a subcontract for ARS to work on one of its projects, the Waterfront (the "Waterfront Subcontract").[1] Compl. ¶¶ 4, 9–13.

---

[1] Services alleges that ARS performed defective work under the Waterfront Subcontract and that Services was forced to fix the defects at its own cost. Compl. ¶¶ 12–13. ARS denies these allegations. ECF No. 8, Answer ¶ 10.

Though they relate to different construction projects for different Trident Entities, Builders's Cape Subcontract and Services's Waterfront Subcontract follow the same standard forms and contain identical arbitration provisions. Compare ECF No. 1-1, with ECF No. 1-2. However, unlike the Cape Subcontract, both ARS and Services signed the Waterfront Subcontract. See ECF No. 1-2 at 6.

      Builders and Services filed this lawsuit against ARS on April 24, 2024. ECF No. 1, Compl. They alleged four causes of action: (1) breach of contract based on the Waterfront Subcontract, (2) breach of contract based on the Cape Subcontract, (3) promissory estoppel based on the Cape Subcontract, and (4) negligent misrepresentation based on the Cape Subcontract. Id. ¶¶ 27–54. The following day, Builders and Services moved to stay the case and compel arbitration. ECF No. 6. On June 11, 2024, ARS answered Builders and Services's complaint, ECF No. 8, Answer, and responded in opposition to their motion, ECF No. 9. Builders and Services replied on July 2, 2024. ECF No. 15.

      On July 23, 2024, the court granted Builders and Services's motion in part (the "July Order"). ECF No. 17. Specifically, the court compelled arbitration between Services and ARS, severed the claims Services asserts against ARS related to the Waterfront Subcontract (i.e., Count I) from the claims Builders asserts against ARS related to the Cape Subcontract (i.e., Counts II through IV), and stayed the case between Services and ARS pending the results of arbitration. Id. at 5–6 & n.2; see also ECF No. 30; Trident Constr. Servs., LLC v. Am. Residential Servs., LLC, No. 2:24-cv-07741-DCN. The court then explained that it required additional briefing before it could rule on whether to compel arbitration of the dispute between Builders and ARS related to the

3

Cape Subcontract. ECF No. 17 at 6–12. Thus, on August 13, 2024, Builders filed a supplemental response in support of its motion to stay and compel arbitration, ECF No. 20, and ARS then filed a supplemental response in opposition to Builder's motion on August 26, 2024, ECF No. 22. On February 3, 2025, the court held a hearing on the motion. ECF No. 31. As such, the motion is now fully briefed and ripe for the court's review.

## II. STANDARD

The Federal Arbitration Act ("FAA") creates a strong presumption in favor of arbitration. See 9 U.S.C. §§ 1–14. As the Supreme Court has explained, "[t]he preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985). Arbitration "is a matter of consent, not coercion." E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 294 (2002); see also Arrants v. Buck, 130 F.3d 636, 640 (4th Cir. 1997) ("Even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate."). Thus, arbitration "is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299 (2010) (internal quotation marks and citations omitted).

> Application of the FAA requires demonstration of four elements: (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.

Galloway v. Santander Consumer USA, Inc., 819 F.3d 79, 84 (4th Cir. 2016) (internal quotation marks omitted) (quoting Rota-McLarty v. Santander Consumer USA, Inc., 700 F.3d 690, 696 n.6 (4th Cir. 2012)).

The party seeking to compel arbitration has the burden of establishing the formation of an agreement to arbitrate. Mercury Constr. Corp. v. Moses H. Cone Mem'l Hosp., (In re Mercury Constr. Corp.), 656 F.2d 933, 939 (4th Cir. 1981) (en banc), aff'd sub nom. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983); Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., 867 F.3d 449, 456 (4th Cir. 2019). The question of whether parties formed an agreement to arbitrate is generally governed by ordinary state-law principals of contract formation. First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Courts in the Fourth Circuit determine whether to compel arbitration by employing "a standard such as the summary judgment test." Berkeley Cnty. Sch. Dist v. HUB Int'l Ltd., 944 F.3d 225, 234 (4th Cir. 2019). "If the record reveals a genuine dispute of material fact regarding the existence of an agreement to arbitrate, the court shall proceed summarily and conduct a trial on the motion to compel arbitration." Id. (citations and internal quotation marks omitted).

### III.   DISCUSSION

In its July Order, the court directed Builders to address three key issues in its supplemental briefing. First, Builders needed to explain whether the validity of the Cape Subcontract is a question for the arbitrator or for this court. ECF No. 17 at 9. Second, Builders needed to address whether it could invoke the mandatory arbitration provision in

5

the Waterfront Subcontract even though it was not a signatory to that agreement.[2]  ECF No. 17 at 10.  Third, Builders needed to address whether it ever entered into a valid agreement to arbitrate the Cape Subcontract even though that agreement was never signed.  Id. at 10–11.  The court further emphasized that contract formation issues are matters of state law, and that, if a trial pursuant to 9 U.S.C. § 4 were necessary, such would only be the case if there were a genuine dispute of material fact regrading the existence of an agreement to arbitrate under South Carolina law.  ECF No. 17 at 11–12.  The court also ordered ARS to respond to Builders's supplemental briefing on these questions.  Id. at 12.

As for the first issue, Builders concedes in its supplement that the arbitrability of the Cape Subcontract is a question for this court, rather than an arbitrator.  ECF No. 20 at 1–2.  The court agrees.  See Coinbase, Inc. v. Suski, 602 U.S. 143, 150–51 (2024).  Moving to the second issue, Builders does not point to any authority suggesting that South Carolina law would permit it to enforce the arbitration provision in the Waterfront Subcontract, see ECF No. 20 at 7, and Builders confirmed during the hearing that it is not seeking to enforce the arbitration provision in the Waterfront Subcontract against ARS, ECF No. 31.  Thus, the only remaining issue for the court to decide is whether, under South Carolina law, Builders and ARS entered into a valid agreement to arbitrate the Cape Subcontract.  Ultimately, the court finds that Builders has not made this prima facie showing—in other words, the court finds that there is not a genuine issue of material fact

---

[2] In other words, the court asked whether the dispute between Builders and ARS "coulda been a contender" for mandatory arbitration based on the Waterfront Subcontract.  On the Waterfront (Horizon-American Pictures, Inc. 1954).

with respect to whether Builders and ARS formed an agreement to arbitrate the Cape Subcontract.

"The necessary elements of a contract are an offer, acceptance, and valuable consideration." Sauner v. Pub. Serv. Auth. of S.C., 581 S.E.2d 161, 166 (S.C. 2003). "In order for a contract to arise, there must be a meeting of the minds of the parties involved with regard to all essential and material terms of the agreement." Hardaway Concrete Co. v. Hall Contracting Corp., 647 S.E.2d 488, 492 (S.C. Ct. App. 2007) (citing Player v. Chandler, 382 S.E.2d 891, 893 (S.C. 1989)). "Thus, for a contract to be binding, material terms cannot be left for future agreement." Stevens & Wilkinson of S.C., Inc. v. City of Columbia, 762 S.E.2d 696, 701, 703 (S.C. 2014) ("[A]s long as the parties know there is an essential term not yet agreed on, there is no contract."). "In a contract for services two essential terms are the scope of the work to be performed and the amount of compensation." Id. at 701 (quoting W.E. Gilbert & Assocs. v. S.C. Nat'l Bank, 330 S.E.2d 307, 309 (S.C. Ct. App. 1985)). "Although the existence of a contract is ordinarily a question of fact for the jury, where the undisputed facts do not establish a contract, the question becomes one of law." Id. "An agreement which leaves open material terms is unenforceable." Id.

Builders first cites to an affidavit of Dillon Sperry ("Sperry"), Builders's Project Manager. ECF No. at 3. Builders contends that, in this affidavit, Sperry "set[s] out facts demonstrating ARS' intent to perform and be bound by the terms of the Cape Subcontract delivered to ARS on September 21, 2021." ECF No. 20 at 3 (citing ECF No. 15-1, Sperry's 1st Aff.). The operative paragraphs from Sperry's affidavit state:

> 3. I was involved in the dealings with ARS regarding the Cape.

7

4. ARS bid the job, produced a design for the HVAC systems for the various buildings, received our subcontract, attended on-site meetings with Trident Builders and the owners of the project, submitted revised cost estimates, and always indicated their agreement to fully perform the subcontract.

5. I never had any reason to doubt that ARS would abide by its agreement, especially given ARS' decades-long history as a subcontractor for various Trident entities.

6. ARS abandoned the project, and Trident was forced to find another HVAC contractor to complete the project, at substantially greater expense to Trident Builders and with substantial delay.

Sperry's 1st Aff. ¶¶ 3–6. The court finds that Sperry's conclusory statements that ARS intended to be bound by the Cape Subcontract are insufficient to demonstrate a genuine issue of material fact regarding the formation of that contract. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) (explaining that affidavits cannot defeat summary judgment if they are conclusory or based on hearsay).

Builders next points to a series of email exchanges that it argues further show that ARS intended to be bound by the terms of the Cape Subcontract. ECF No. 20 at 3–4. First, Builders points to an email Billy Strickland ("Strickland"), an ARS employee, sent to Sperry regarding updated project requirements in which Strickland stated, "I assume this means we're going as shown, hp and ac units?"[3] ECF No. 20 at 3 (quoting ECF No. 20-2 at 1). Second, Builders points to an email exchange in which Sperry adds Strickland to Builders's Plangrid, and Builders explains in its supplement that it only gives Plangrid access to subcontractors. ECF No. 20 at 4 (citing ECF No. 20-3). Third, Builders points to an email exchange in which Strickland wrote:

> This [sic] dehumidifier and unit bath fans are attached. This Panasonic fan is what we used at Waterfront. Not only is it one of the quietest fans out there it saves confusion from not having to use multiple fan model. There

---

[3] Builders does not explain why it believes this sentence supports its position.

8

>is a CFM Selection Switch and the selections cover what we need in all buildings.

ECF No. 20 at 4 (quoting ECF No. 20-4 at 3). Finally, Builders points to a certificate of insurance showing that ARS received a commercial general liability insurance policy which lists Builders as an additional insured. ECF No. 20 at 4 (citing ECF No. 20-5).

After describing this evidence, Builders states:

>Builders reasonably relied on the above representations and conduct as confirmation that ARS intended to be and was bound by the terms of the Subcontract. ECF No. 15-1 [Sperry's 1st Aff.] In conjunction with the provision that states ARS is bound by the terms of the Cape Subcontract by its performance of the same, Builders has demonstrated a prima facie case that the parties to the unsigned Cape Subcontract agreed to its terms, including the written arbitration provision.

ECF No. 20 at 4.

In contrast, ARS argues that Builders cannot demonstrate that there was a meeting of the minds because Builders cannot show that the parties reached an agreement on certain material terms, such as the scope of the work to be performed and the amount of compensation. ECF No. 22 at 10. In particular, ARS points to a demand letter that Builders sent ARS on November 11, 2022. ECF No. 22 at 11.

In the letter, Builders states that it "issued a formal contract to [ARS] on September 3, 2021." ECF No. 6-4 at 3 (emphasis added). However, Builders then goes on to express its frustration that, since issuance of the Cape Subcontract, it has had numerous discussions with ARS to "resolve [ARS's] scope questions," and that Builders "met on Friday October 7th[4] to review [ARS's] updated project pricing as some increases had occurred since the subcontract was issued." Id. (footnote added). The letter then

---

[4] Though the letter does not specify, the court assumes this is October 7, 2022, because October 7 fell on a Friday in 2022 and on a Thursday in 2021.

states: "[Builders] agreed to the new pricing and sent a Change Order to increase the subcontract to the new value on October 11th. The project has progress on schedule, and everything was in place for ARS to get [sic] begin work onsite in mid-October." Id. (emphasis added).

The court agrees with ARS. Builders has simply not carried its burden of showing that the parties ever formed a contract that includes an agreement to arbitrate. Indeed, the demand letter indicates that ARS had not begun performance and ARS and Builders were still negotiating price and scope in October and November 2022, over a year after Builders "issued" the Cape Subcontract. See ECF No. 6-4 at 3. It may be possible that Builders and ARS formed a contract at some point after September 2021, but if that were the case, Builders has not supplied any evidence on when that agreement was accepted or when the parties reached a meeting of the minds on the essential terms of the agreement. See Stevens & Wilkinson, 762 S.E.2d at 701, 703. Thus, Builders has not shown that the parties ever agreed to the arbitration provision in the Cape Subcontract.[5]

---

[5] Additionally, Builders argues that the parties' course of dealing shows that they had a valid contract even though they never signed the Cape Subcontract. ECF No. 20 at 6. However, Builders concedes that it had never previously entered into a subcontract with ARS. Id. Builders argues that ARS had worked with Sperry on other subcontracts with other Trident Entities. Id. This argument is unconvincing. First, ARS's prior dealings with Sperry (a non-party, who was working for a different Trident Entity) does not establish a course of dealing with Builders. See Dowling v. Charleston & W.C. Ry. Co., 81 S.E. 313, 314 (S.C. 1913) ("The law implies a contract between persons where the ordinary course of dealing between them, considered in the light of all the circumstances, reasonably warrants the inference that they mutually intended to contract." (emphasis added)). Second, Sperry's second affidavit only mentions working with ARS on one other project, ECF No. 20-1 ¶ 3, which is insufficient to establish a course of dealing, see Temptron, Inc. v. Dixie Fire & Cas. Co., 127 S.E.2d 4, 7 (S.C. 1962) ("A single transaction does not establish an effective course of dealing on which an assumption of acceptance may arise."). Finally, if course of dealing were relevant here, it

Beyond that, Builders alternatively argues that, even if the parties did not form a valid contract, the court can enforce the arbitration provision in the Cape Subcontract under the doctrine of equitable estoppel. See ECF Nos. 20 at 2–3; 31.[6] "In the arbitration context, the doctrine [of equitable estoppel] recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." Est. of Solesbee ex rel. Bayne v. Fundamental Clinical & Operational Servs., LLC, 885 S.E.2d 144, 148 (S.C. Ct. App. 2023) (quoting Pearson v. Hilton Head Hosp., 733 S.E.2d 597, 601 (S.C. Ct. App. 2012)). However, Builders has not pointed to any evidence suggesting that ARS has attempted to enforce any provision in the Cape Subcontract to its benefit. Therefore, the court finds

---

would show that, when ARS previously entered into contracts with Trident Entities, both parties signed and initialed those agreements. See ECF Nos. 1-2; 6-5. Therefore, the parties' course of dealing in this case does not demonstrate that they agreed to arbitrate the Cape Subcontract.

[6] In making this argument in its supplement, Builders relies exclusively on the South Carolina Court of Appeal's decision in Powers Construction Co. v. Salem Carpets, Inc., 322 S.E.2d 30, 33 (S.C. Ct. App. 1984). ECF No. 20 at 2–3. However, that case concerned promissory estoppel. See Powers Constr., 322 S.E.2d at 33. During the hearing, Builders clarified that it is basing its argument on equitable estoppel. ECF No. 31. Because promissory estoppel and equitable estoppel are separate concepts under South Carolina law, see Thomerson v. DeVito, 844 S.E.2d 378, 382 n.5 (S.C. 2020), the court finds that Powers Construction, 322 S.E.2d at 33, is inapposite. Beyond that, Builders has not pointed to any cases in which a South Carolina court enforced an arbitration provision in an unsigned contract under the doctrine of promissory estoppel, and Builders has not presented evidence establishing the elements of promissory estoppel. See Cruz v. City of Columbia, 904 S.E.2d 451, 453 (S.C. 2024) (listing the elements of promissory estoppel); Powers Constr., 322 S.E.2d at 33 (same); see also Warciak v. Subway Rests., Inc., 880 F.3d 870, 872–73 (7th Cir. 2018) (finding promissory estoppel did not bind parties to an arbitration provision in an unsigned contract under Illinois law when the claimant failed to produce evidence showing detrimental reliance).

that enforcement of the arbitration provision under the doctrine of equitable estoppel is not appropriate in this case.

## IV.  CONCLUSION

For the reasons set forth above, the court **DENIES** Builders's motion to compel arbitration.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON
UNITED STATES DISTRICT JUDGE**

**February 5, 2025
Charleston, South Carolina**